PULLMAN PALACE CAR COMPANY ET AL. v. SAMUEL HOCKER.

Decided February 10, 1906.

**1.—Pullman Company—Contract for Berth—Liability for Breach.**

A passenger contracted for accommodations in a Pullman Palace car between two certain points on a line of railway. Before reaching its destination the Pullman car was detached from the train and attached to another train going in the opposite direction. The train conductor and the employes of the Pullman Company persistently insisted on said passenger being transferred from the sleeping car to a chair car and so conveyed to her destination. The manner of their insistence caused said passenger to become the object of the curious and annoying gaze of other passengers, causing humiliation, mortification and mental anguish on the part of said passenger. This was continued until said passenger, under a threat of being carried back to Kansas City on said sleeper, consented to leave the sleeper. Held, that the purchase of a berth in the Pullman car was a contract for transportation in said car to destination; that by requiring said passenger to leave the Pullman car before reaching her destination both the Pullman Company and the railway company were guilty of a breach of said contract, and liable for resulting damages.

Appeal from the District Court of Bowie County. Tried below before Hon. P. A. Turner.

*J. M. McCormick,* for the Pullman Company, appellant.—Under the plaintiff's allegations, and the undisputed proof, at the close of the testi-

mony, no cause of action had been disclosed against the Pullman Company. Pullman Palace Car Co. v. Matthews, 74 Texas, 656; Pullman Palace Car Co. v. Smith, 79 Texas, 472; Pullman Palace Car Co. v. Cain, 40 S. W. Rep., 220; Blum v. Southern P. P. Car Co., 1 Flippin, 500; Sims v. South P. Car Co., 22 Fed. Cases No. 12869a; Campbell v. Pullman P. Car Co., 42 Fed. Rep., 484; Duvall v. Pullman P. Car Co., 62 Fed. Rep., 265; Paddock v. Atchison, T. & S. F. R. R. Co., 37 Fed. Rep., 841; Ulrich v. New York, C. & H. R. R. R. Co., 108 N. Y., 84.

That the court erred in refusing to instruct the jury as requested by defendant, that the sleeping car conductor, under the evidence, was acting as the agent of the railway company and not as the agent of the Pullman company. Pennsylvania Co. v. Roy, 102 U. S., 451; Williams v. Pullman P. Car Co., 4 So. Rep., 85; Dwinelle v. New York C. Co., 120 N. Y., 117.

If the evidence warranted any recovery against the Pullman Company the measure of such recovery should have been confined to the physical discomforts caused by deprivation of sleeping car accommodations for the remaining thirty-nine miles. Missouri Pac. Ry. Co. v. Groesbeck, 24 S. W. Rep., 702; Pullman P. Car Co. v. Reed, 75 Ill., 125; 25 Am. and Eng. Ency. of Law, 1124.

*Glass, Estes & King,* for Kansas City Southern Railway Company, appellant.—In the event of an accident or disaster to a railroad train, or to one of its cars, the company has a right, and its duty is, to so arrange the movements and location of its other cars as will best meet the necessities of the general traveling public; and if, as a result of such rearrangement, passengers on a Pullman car are compelled to ride in a chair car, the railroad company is liable to such passengers, only for such amount of Pullman fare, as has been unearned. Elliott on Railroads, vol. 1, secs. 1 and 2; 23 Am. and Eng. Ency. of Law, Rev. Ed., pp. 674-5; Miller v. Georgia R. R. Co., 88 Ga., 563; 30 Am. St. Rep., 175; Pennsylvania R. R. Co. v. Midvale Steel Co., 201 Penn. St. Rep., 624; 88 Am, St. Rep., 836; Missouri Pac. v. Groesbeck, 24 S. W. Rep., 702; The Gospel of St. Matthew, chap: 22, verses 37 to 40.

There is no actionable wrong in approaching or conferring with a passenger in order to induce him to waive the contract which has been entered into. If any embarrassment, mental anguish or suffering attends such conference, no recovery can be had. As applied to the fact of this case, if the embarrassment caused Mrs. Hocker was the result of the lawful attempts on the part of the conductor to induce her to get out of the car without compulsion, then for such embarrassment, she is not entitled to recover.

Inasmuch as the only proof in this case of mental suffering endured by her was the embarrassment caused by the gaze of people who gathered around, the charge of the court should have limited the jury to the consideration of that particular suffering, if it should have been submitted at all, and should not have permitted the jury to "take into consideration any mental suffering, or humiliation by Mrs. Emma Hocker, if any." 8 Am. and Eng. Ency. of Law (Rev. Ed.), 672; Pullman Co. v. Fowler, 27 S. W. Rep., 269; Nichols v. Eddy, 24 S. W. Rep., 316;

Hale v. Bonner, 82 Texas, 33; International & G. N. v. Locke, 67 S. W. Rep., 1084; Gulf, C. & S. F. Ry. Co. v. Robinson, 72 S. W. Rep., 70; City of Dallas v. Moore, 74 S. W. Rep., 95.

It was for the jury to say, under all of the facts in this case, whether Mrs. Hocker voluntarily left the car. It was improper and erroneous for the court to take this right from the jury and instruct them as to what would and would not constitute a voluntary leaving of the car. The charge was therefore on the weight of the evidence, and should not have been given. St. Louis Ry. Co. v. Sibley, 68 S. W. Rep., 516; St. Louis Ry. Co. v. Caseday, 40 S. W. Rep., 198; Missouri, K. & T. Ry. Co. v. Brown, 39 S. W. Rep., 328.

*Hart, Mahaffey & Thomas,* for appellee.—The contract between the Pullman Company and Mrs. Hocker was unconditional and conferred upon her the absolute right to be carried in said car to Texarkana, and nothing done by the railway company could absolve the Pullman Company from the duty it owed her under said contract.

If the sleeper in which Mrs Hocker was riding was carried back north and Mrs. Hocker forced to leave same and ride in the chair car, at the instance and request of the Pullman Company, or if it concurred in or consented to the transaction, then the Pullman Company is liable. Pullman P. Car Co. v. Booth, 28 S. W. Rep., 719; Pullman P. Car Co. v. Cain, 40 S. W. Rep., 220.

Mrs. Hocker being a passenger upon the Pullman car, it became, and was, the duty of the Pullman Company not only to carry her safely in said car from Neosho to Texarkana, but to guard and protect her against annoyance, humiliation and embarrassment at the hands of any and all persons, and if it failed in any of these duties it is liable to plaintiff for the damages sustained by his wife because of such failure. Houston, E. & W. T. Ry. Co. v. Perkins, 21 Texas Civ. App., 508.

RAINEY, CHIEF JUSTICE.—Samuel Hocker brought this suit to recover damages of the Pullman Palace Car Company and the Kansas City Southern Railway Company. The allegations in substance being that on September 2, 1903, the plaintiff's wife, with her baby, boarded one of the railway company's trains at Neosho, Missouri, for the purpose of going to Texarkana, Texas; that after boarding same she purchased from the Pullman Company a berth in one of its cars, destined for Texarkana, by which it bound itself to furnish the usual accommodations to that point. After traveling in said sleeper to Winthrop, a station on said road, the agents and servants of defendants demanded that she vacate the sleeper and take a chair car, with the statement that they had orders to carry said sleeper back to Kansas City; that said demand was refused, and under the threat that if she did not leave said sleeper she would be carried back to Kansas City, she left said sleeper and was compelled to travel in a chair car to Texarkana from Winthrop; that said demand and threats were made in the presence of other passengers, and the insistence of said agents for her to leave the sleeper was prolonged for about an hour and attracted others to the sleeper, who would look and gaze at plaintiff's wife and make remarks about her, all of

which caused her much mortification, humiliation and mental suffering; that thereupon she left the sleeper and rode to Texarkana, a distance of forty miles, in a chair car, which was far inferior in acommodations to the sleeper, etc.

The railway company answered that it furnished plaintiff's wife a first class chair car, all it had agreed to furnish. That she left said sleeper voluntarily at the request of an acquaintance, who made the statement that the north-bound Pullman in which he was traveling had broken down and would be left at Texarkana, and it would be a great accommodation if plaintiff's wife would vacate and allow his sick family to use the Pullman; that the railway company was operating a through train from Kansas City to Shrevesport, and hauled a Pullman sleeper each way, under an agreed charge with the Pullman Company, etc.; that the north-bound Pullman car for Kansas City had been disabled and left at Texarkana for repairs, that it was occupied by a large number of people who left it at Texarkana and had ridden in a chair car to Winthrop, some intending to make an all-night trip and some were sick; that no one riding in the sleeper was going beyond Texarkana, and then plaintiff's wife was requested to vacate so the sleeper might be attached to the north-bound train; that it had a right under the circumstances, for the accommodation of its passengers, to turn the sleeper back to Kansas City.

The Pullman Car Company answered that it had no control over the movements of said sleeper, but that it was entirely under the control of the railway company. It denied that it was a carrier of passengers and that it had made a contract of carriage; that its contract with plaintiff's wife bound it to assign her a berth, which berth, or a similar one, she would be entitled to use until the car should be hauled to Texarkana, should said railway company transport same to that point. That the purchase from the railway company of a first-class ticket was a condition precedent to her procuring accommodations in the sleeper, and that if plaintiff's wife was prevented from continuing said journey in said sleeper it was because the railway company refused to haul it farther, and it was no fault of the Pullman Company.

Plaintiff filed a supplemental petition, excepting to the answer of the railway company and a plea that the sleeper was a part of said train, pulled by a locomotive of said railway company, and denied that his wife left said sleeper on the solicitation of an acquaintance, but that she left said sleeper because of the insistent, peremptory demand of the agents and servants of defendants.

A trial resulted in a verdict and judgment against both defendants, from which this appeal is prosecuted.

The facts are that Mrs. Hocker, wife of plaintiff, bought at Texarkana a round trip ticket to Neosho, Missouri, over the Kansas City Southern Railway. On September 2, 1903, desiring to return, she boarded a train with a Pullman car attached on the railway company's line at Neosho, intending to go to Texarkana. She entered the sleeper and paid the Pullman conductor $2.50, the fare from Neosho to Texarkana. She had with her a baby and nurse. She rode in said sleeper until Winthrop was reached, about 10 o'clock at night, at which place she was compelled by the agents and servants of the defendants to leave the sleeper

and go into a chair car, in which she made the balance of her journey to Texarkana, a distance of about forty miles.

The circumstances attending her leaving the sleeper at Winthrop are in substance as follows: When the train reached Winthrop Mrs. Hooker's berth on the sleeper had been made down and her baby had gone to bed. She had not retired, but had made herself comfortable and was lounging. Just before reaching Winthrop the Pullman conductor told her they would soon reach Winthrop, where she would have to change cars. She told him that she supposed not—that there must be some misunderstanding, and asked if there was another sleeper, and he said there was none, and told her she would have to go into the chair car. She replied that she did not think she could go into the chair car. He then left her. She meditated over it and concluded she was entitled to a sleeper to Texarkana. The conductor came back and told her they were near Winthrop and she would have to leave the car. She replied that she could not get off the car; that she had bought a ticket and was entitled to passage to Texarkana and could not change unless she was provided with another sleeper, and he said, "there is no other sleeper on here and you will have to go in the chair car." She replied that she could not do that; that she had her baby and had put him to bed and that he must carry her to her destination. He said he could not do that; that the car was going back and she must change cars at Winthrop and go into the chair car. She told him it was impossible, that her baby had retired and she could not take him into the chair car. The conductor then went out, and in a few minutes the train conductor came in and told her that she was delaying the car; that they had reached Winthrop and she must make preparations to get off and not delay the car, that they were late and in a hurry, and she must not delay the car any longer. She told him she could not, that she had a ticket to Texarkana and would ride on it. He went out and in going out said, "Make your preparations to leave this car immediately, we have no time to parley." She made no preparations to leave the car and in a little time he came back and said: "Madam, we don't want any further delay about this matter, make your preparations to leave this car at once, we are in a hurry and late, you must get out and get out in a hurry." She said, "You are not in any bigger hurry than I am, we are already five hours late and I am just as anxious to get into Texarkana as you are to move on, and would be very glad to move on." He said, "We will not move out till you get off and if you don't get off I will take you back to Kansas City." She said, "Very well, you have to take me back for I am not going to vacate until I reach my destination." He went out and then returned in a little while and told me of a wreck in or near Sulphur Springs, that ladies and children were suffering and needed the sleeper and asked if I had no sympathy. She told him yes, that she was a woman herself, and had a baby, and if in that fix she would like relief, but Sulphur Springs was nearer Kansas City than this point and a sleeper should be taken out from there. He laughed and walked away and said, "Can not talk to that woman." He returned in a short time and told her he had a telegram; that he had just wired into Texarkana that she had refused to leave the car and orders were to force her off the car or take her on to Kansas City. She said, "Very well, you will have to take me to

Kansas City, because you can not force me off the car." He then turned to the Pullman conductor and said, "What fare did she pay?" and he replied: "$2.50." The train conductor then said: "Here is your money, I will return you your money." She replied, "It is not the money I want, it is the sleeper. If I had wanted the money I would have kept it in the beginning." He then went out of the car and came back and said, "I have another telegram, and I am forced to put you off this car or take you back to Kansas City." She continued to tell him she would not leave the car and he insisted that she should, though she testified it was impossible for her to go back as her baby was a bottle baby and she was not prepared with proper nourishment for him. She then acknowledged to him that on account of her baby it would be impossible for her to go back and told him she would leave the car if he would give her a written order to do so. This he started to do when some gentleman touched him on the arm and took him to one side and after a short conversation he came back and said he had reconsidered and could not give the written order. "I told him to call four parties and give me the order in their presence, which was done." She then left the car and went into the chair car and after walking up and down the aisle for some minutes looking for a seat, two gentlemen gave her a seat. It was at the front end of the car and baggage was piled up quite high, and no place to put her feet, except on the grips, and the wind was blowing through the door on them. Just as she was leaving the sleeper she met a Mr. Norris, an acquaintance, who assisted her to the chair car. About one hour was consumed in the attempt to induce Mrs. Hocker to leave the car and many persons came in and gazed at her, while others seemed to have gathered boxes and stools and climbed up to the window and were staring in, which was embarrassing and humiliating to her. She did not leave the car voluntarily at the solicitation of a friend, but on account of the repeated threats to take her back to Kansas City. During this time the north-bound train was standing at Winthrop and on this north-bound train were a number of passengers for whom the sleeper in which Mrs. Hocker was was wanted, the north-bound sleeper having been disabled and left at Texarkana for repairs.

The train conductor had control of the movements of the train and the Pullman employes were subject to his control in this respect. The Pullman conductor collected the Pullman fares and had control of the accommodations afforded by the sleeper, and the Pullman conductor was present and aiding the train conductor during the time said train conductor was endeavoring to induce Mrs. Hocker to leave the train.

Mrs. Hocker, by reason of having to leave the sleeper and the treatment received and having to ride in a chair car to Texarkana, was caused to suffer inconvenience, discomfort, humiliation and mental anguish.

The first proposition submitted by the Pullman Palace Car Company is that the court erred in not giving a peremptory instruction to the jury to find for it, the contention being that under the allegations and evidence no right of recovery was disclosed against it. To this contention we do not agree. It made a contract by which it agreed to furnish sleeper car accommodations to plaintiff's wife from Neosho to Texarkana. It complied with its contract to the extent of furnishing such accommo-

dations as far as Winthrop, but there it breached its contract, and we are unable to see that it should be held excusable for such breach. It claims that it is not responsible for such breach, because it had not contracted to transport, which was the railway company's liability, and the railway company having failed to haul the sleeper, being a condition precedent of its contract, it is absolved from liability. This condition is not expressed in the contract, nor was it in any way expressed when plaintiff's wife paid her fare. It can not be implied, for there is nothing from which Mrs. Hocker was required to take notice that any such condition was contemplated. She knew nothing of the contract that existed between the railway company and the Pullman Company, and is not bound thereby.

The Pullman Company had bound itself to allow Mrs. Hocker to occupy said sleeper until it reached Texarkana, and in that sense it had obligated itself that Mrs. Hocker should be transported in that manner. But it says that the wrong was perpetrated by the railway company. The railway company says it was only obligated to furnish first-class transportation, and this it did by furnishing a chair car for Mrs. Hocker to ride in. We are unable to escape the conclusion that both are liable jointly. The Pullman employes aided in forcing Mrs. Hocker to leave the sleeper. The Pullman conductor first requested her to leave the sleeper. But the Pullman Company attempts to avoid this on the ground that he was acting under orders from the train conductor. This, we think, is no excuse. He did not tell Mrs. Hocker he was acting for the train conductor, and when he ascertained that she would insist on her contract being carried out, he should not have acquiesced in the railway company breaching the contract, but should have protested against its doing so.

The court did not err in telling the jury that it was the duty of the Pullman Car Company to furnish Mrs. Hocker transportation in the sleeper from Neosho to Texarkana. The contract made by Mrs. Hocker with the Pullman Company was so conditioned. The use of the term "transportation" as used by the court could not have misled the jury. There was no question raised that she was not transported to Texarkana, but the issue was as to her not being allowed to remain in the sleeper and carried therein to her destination, as per contract.

The court gave the following instruction, to wit: "1 further charge you that the defendants, nor either of them, had the right to tender or pay Mrs. Hocker back the $2.50, the amount paid by her for the privilege of riding in and being transported in said Pullman car from Neosho to Texarkana, and then require her, against her consent, to transfer from the Pullman sleeper to the chair car." This charge is objected to on the ground that there was no evidence that the Pullman Company ever tendered back the money. There was evidence that the money was tendered back by the train conductor in the presence of the Pullman conductor, and there is evidence that the two conductors were acting in concert. The railway company also objects to this charge because in order to meet an unforeseen and unexpected contingency, it had a right to transfer the sleeper to the north-bound train, etc.

Mrs. Hocker's rights to be transported in the Pullman sleeper were contractual, and the circumstances were not such as would relieve the

railway company from liability in its breach of the contract. There was no error in giving the charge.

We will now notice the railway company's contention. The court charged the jury in effect that if the north-bound train pulled out of Texarkana without a sleeper intending to get the south-bound sleeper, and leave the south-bound train without a sleeper, such facts would not excuse or justify either of the defendants in requiring Mrs. Hocker to transfer to the chair car. This is objected to as a charge on the facts and told the jury such facts did not constitute a justification, when it was for the jury to say under all the circumstances, whether it was a reasonable and lawful demand of the company in the careful and proper operation of the road: "and whether transportation in the Pullman car was an incident to the trip, instead of a binding and inviolable contract." We see no error in this action of the court. The circumstances proven did not afford any legal excuse or justification to require Mrs. Hocker to leave the sleeper. The contract with her was a binding one and to relieve the railway company a better excuse should have been shown. There was no error in giving the charge.

The fifth paragraph of the court's charge is: "Should you find for plaintiff, you will give him such sum as will compensate him for the injury, if any, his wife has sustained, taking into consideration the inferior conveniences and comforts of travel on a chair car to those on a Pullman sleeping car, and also taking into consideration any mental suffering and humiliation of Mrs. Hocker, if any." In this connection the railway company asked special charges to the effect that if defendant, by the exigencies of the case, through no fault of its own, approached Mrs. Hocker and undertook to get her to change from the sleeper to the chair car, etc., and by reason of such efforts passengers and other persons looked at her, then plaintiff could not recover for any humiliation and distress of mind suffered by her. And also that defendant had the right to approach and confer with Mrs. Hocker and ask her to waive her privilege of riding in the Pullman car and if the result was that Mrs. Hocker was embarrassed or humiliated by the gaze or observation of other people defendant was not liable therefor and the jury should not consider such embarrassment and humiliation in reaching a verdict.

There was no error in the court authorizing the jury to consider the question of mental suffering on the part of Mrs. Hocker. The evidence shows that the defendants' object was that she should vacate the sleeper or be carried back to Kansas City, and when she insisted on her right to be transported to her destination as per contract they persistently insisted upon her vacating the car, which attracted the attention of others to Mrs. Hocker, which was calculated to, and evidently did, mortify her, and it was a question for the jury as to what damages she was entitled to for such mental suffering.

There was no error in not giving the special instructions requested.

While the employes had the right to approach and try to induce Mrs. Hocker to leave the sleeper, they had no right to threaten her with carrying her back to Kansas City with such insistence, if she did not vacate. Had they approached her with the mere intention of gaining her consent to leave the sleeper, it would not have been improper. But

they insisted for three-quarters of an hour, or an hour, using arguments and threats which were far beyond the limit of persuasion, and showing an utter disregard of her rights or pleasure in the premises. This was done with such persistency that she finally left the sleeper to prevent being carried back to Kansas City.

The court told the jury that if she left the sleeper voluntarily she, could not recover. He further told them that if she left the car to avoid being carried back it would not be a voluntary act of leaving. He further told them if she left the car in order to accommodate Mr. Norris and his family that they might have a sleeper it was voluntary and she could not recover. Under the circumstances the jury were properly instructed.

The damages assessed are not excessive and there was no error in refusing a new trial on this ground.

There are other assignments of error presented, but we think none are of merit. The court properly instructed the jury and the evidence warrants the judgment, and it is therefore affirmed.

Justice Talbot disqualified and not sitting.

*Affirmed.*

Writ of error refused.